**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**CHRISTOPHER A. CAGE**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

JOSEPH CURNUTT,                    )
                                   )
    Appellant-Defendant,           )
                                   )
        vs.                      )        No. 33A01-1304-CR-173
                                   )
STATE OF INDIANA,                  )
                                   )
    Appellee-Plaintiff.            )

APPEAL FROM THE HENRY CIRCUIT COURT
The Honorable Mary G. Willis, Judge
Cause No. 33C01-1207-FB-69

**February 14, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Joseph Curnutt appeals after a jury trial from his conviction for one count of class B felony Battery,[1] one count of class D felony Battery,[2] and his admission to his habitual offender status, contending that the trial court abused its discretion by failing to give his tendered instruction on voluntariness, challenging the sufficiency of the evidence supporting his convictions for battery, and arguing that his sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

Curnutt and Jennifer Howard exercised joint custody of their son G.H., who was seven years old at the time of the offenses. In the summer of 2012, Curnutt and G.H. were living with Curnutt's mother, Anna Davis, in Henry County. On the evening of July 20, 2012, Curnutt and G.H. ate supper at home, drove into town, and then returned home. G.H. thought that Curnutt appeared to be drunk because "he was talking sloppy." *Transcript* at 74. G.H. saw his father drinking and saw a full can of beer on the side of the bed.[3] The two watched television for a while prior to retiring to bed at approximately 8:00 p.m. Although Curnutt acted as if he were going to sleep, G.H. thought Curnutt might have been "kind of faking it." *Id*. at 88.

---

[1] Ind. Code Ann. § 35-42-2-1(a)(4) (West, Westlaw current through 1st Reg. Sess. & 1st Reg. Technical Sess.).
[2] I.C. § 35-42-2-1(a)(2)(B) (West, Westlaw current through 1st Reg. Sess. & 1st Reg. Technical Sess.).
[3] We recognize that the record contains G.H.'s conflicting testimony about Curnutt's sobriety, and statement that Curnutt had not been drinking that evening. Consistent with our standard of review, however, we recite the facts most favorable to the jury's verdict.

When G.H. awoke after midnight to the sensation that his back was wet, he discovered that Curnutt was urinating on him. Curnutt's behavior confirmed for G.H. that his father was intoxicated. G.H. went into the next room and washed up with worn clothing before returning to the bedroom. G.H. observed that Curnutt was lying down and continuing to urinate on the bed. G.H., who believed Curnutt was sleeping because his eyes were closed, said to his father, "don't poop on the bed." *Id.* at 77.

In response to G.H.'s comment, Curnutt put his hands around G.H.'s neck and started choking him, "real hard." *Id.* G.H. could not breathe and could barely speak. Curnutt continued choking G.H. for what seemed to G.H. to be half an hour. Curnutt asked G.H. to repeat what he had said. On a scale of zero to ten, with ten representing the most amount of pain and zero representing the least, G.H. described the pain inflicted on him by Curnutt as a "nine and a half." *Id.* at 84.

Eventually, G.H. was able to move off the bed and tried to crawl under it, but Curnutt slapped him with his open hand on G.H.'s right cheek, and pulled G.H. back up on the bed. Curnutt then resumed choking G.H. for a second. This time G.H. could breathe "enough to live." *Id.* at 80. G.H. tried both verbally and physically to get Curnutt to release him, but could do neither. Eventually, when Curnutt stopped, he hugged G.H. and told him he was sorry.

G.H. decided that it was "better to wait," and slept on the edge of the bed where it was not soaked in urine. *Id.* at 82. When G.H. awoke the next morning, he went downstairs, where Davis, his grandmother, saw him. She observed that G.H.'s face was red and swollen,

3

which made her think he was experiencing an allergic reaction. Upon closer examination, Davis noticed that G.H.'s neck was bruised and his eyes were herniated. When G.H. had gone to bed the night before, he had none of the marks or bruises on his face, neck, arms, or chest that were apparent at that time. G.H.'s eyes had not been bloodshot the night before, but were at that time. Davis called for her husband, Timothy, and she took G.H. to the hospital. While at the hospital, in response to questions, G.H. indicated that his throat hurt, and that he could barely breathe. He told the nurse that his pain at that time was about a six on a scale of one to ten.

The emergency room physician, Dr. Craig Boone, found that G.H. had stress petechial in his eyes, a condition which appears in people who have choked to death, and which was consistent with G.H.'s account that his father had strangled him. By observing G.H.'s injuries, Dr. Boone was able to tell that the choking had been severe and that considerable force had been used. Dr. Boone could also tell that G.H. had been choked long enough that he would have been unable to breathe for some time. Dr. Boone testified that from his observations and information obtained from G.H., there was a risk that G.H. could have died as a result of Curnutt's actions.

The State charged Curnutt as described above and at the conclusion of his jury trial, Curnutt was convicted of both counts of battery. He then admitted to his habitual-offender status. The trial court sentenced Curnutt to a fifteen-year term for the class B battery conviction, with a two-year term for the class D battery conviction to be served concurrently.

4

The trial court entered a twenty-year sentence for the habitual offender enhancement.[4]

Curnutt now appeals.

Curnutt contends that the trial court abused its discretion by declining to give his proposed instruction on voluntariness. When an appellant presents a claim of instructional error, our well-settled standard of review guides us as follows:

> The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. In reviewing a trial court's decision to give a tendered jury instruction, we consider (1) whether the instruction correctly states the law, (2) is supported by the evidence in the record, and (3) is not covered in substance by other instructions. The trial court has discretion in instructing the jury, and we will reverse only when the instructions amount to an abuse of discretion. To constitute an abuse of discretion, the instructions given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. We will consider jury instructions as a whole and in reference to each other, not in isolation.

*O'Connell v. State*, 970 N.E.2d 168, 172 (Ind. Ct. App. 2012) (quoting *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010)). Curnutt's proposed instruction on voluntariness reads as follows:

### 1. VOLUNTARY CONDUCT

A person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense.

Authority: Indiana Code § 35-41-2-1

[When evidence raises an issue of voluntariness, modify the instruction defining the offense by adding "and voluntarily" to the essential elements the

---

[4] In our discussion of the sentencing issue presented, we will address, *sua sponte*, a sentencing issue that requires us to remand the matter to the trial court for a more clear sentencing statement.

5

[S]tate must prove. It would normally occur as an element right after the intent element.]

Authority: IN Pattern Instruction No. 9.01 "[O]nce evidence in the record raises the issue of voluntariness, the [S]tate must prove the accused acted voluntarily beyond a reasonable doubt." *Baird v. State*, 604 N.E.2d 1170, 1176 (Ind. 1992); but see *Davidson v. State*, 849 N.E.2d 591 (Ind. 2006) (holding that evidence of involuntary intoxication does not require instruction including voluntariness as element of crime, although evidence supported an involuntary intoxication defense).

*Appendix* at 43.

At trial, the State presented G.H.'s testimony about his father's intoxication, that he had seen his father drinking, that there was a can of beer on the nightstand by the bed, and that his father's speech was impaired. G.H. further testified that his belief that his father was intoxicated was confirmed when he awoke to find his father urinating on him. G.H. testified that Curnutt grabbed him and asked him to repeat what he had said. When the final choking had ended, Curnutt hugged G.H. and apologized. Curnutt, on the other hand, argued that his behavior was the result of an incident of somnambulism, and asserted in support of the proposed instruction that his somnambulism rendered his conduct involuntary.

Assuming, *arguendo*, that the trial court abused its discretion by declining to give the proposed instruction, Curnutt has failed to show how his substantial rights were prejudiced by the trial court's decision. In order to warrant the reversal of a conviction based upon instructional error, a defendant must show that the error prejudiced his substantial rights. *McBride v. State*, 785 N.E.2d 312 (Ind. Ct. App. 2003).

Curnutt's counsel suggested to the jury during opening statements that Curnutt was not guilty of the offenses because the evidence would show that Curnutt's behavior on the

6

night in question was the result of his sleep walking. Counsel for Curnutt also said during opening statement, specifically referring to Preliminary Instruction No. 3, "The very first line of these instructions say[s] that a person who knowingly or intentionally . . . . How many of you . . . [have] been sleep walking or doing something in your sleep that you had no idea. You couldn't stop and you could not have intended to do it." *Transcript* at 61.

Davis, Curnutt's mother, testified that she had observed Curnutt walk in his sleep on previous occasions. On those occasions, however, Curnutt had never been violent, and did not urinate around the house. When spoken to, Curnutt would ask where he was and exhibit behavior consistent with disorientation. Davis's husband testified that when he asked Curnutt about what had happened to G.H., Curnutt had no recollection. Although nothing precluded the opportunity for him to do so, Curnutt did not present medical evidence linking the attack on G.H. with Curnutt's alleged somnambulism. During closing argument, Curnutt's counsel reiterated that "the most important element of our criminal justice center is the intent—the intent. It's just not the act. You have to have the criminal intent as well." *Id.* at 157. He summed up his argument by suggesting that the only verdict the jury could reach was "Not guilty. . . . because they can't get over the intention or knowingly." *Id.* at 159.

"Once evidence in the record raises the issue of voluntariness, the State must prove beyond a reasonable doubt that the defendant acted voluntarily." *O'Connell v. State*, 970 N.E.2d 168, 174 (Ind. Ct. App. 2012). Assuming that Curnutt's theory and argument that his conduct was the result of somnambulism raises the issue of voluntariness, we find that Curnutt's argument on appeal fails.

7

Our Supreme Court has stated as follows regarding voluntariness:

> The drafters of Indiana's voluntariness provision used section 2.01 of the Model Penal Code as the source. IND. CRIM. LAW STUDY COMM'N, IND. PENAL CODE PROPOSED FINAL DRAFT 11–12 (1974). The American Law Institute report on the provision indicates that its purpose is to exclude from voluntary conduct those mental impairments that are the product of an otherwise healthy mind. The illustrative examples are reflexes, convulsions, unconsciousness (for example, a driver who loses consciousness and runs over a pedestrian), somnambulism, hypnosis, and a residual category for movements not a product of the actor's effort (where the actor is moved by force). MODEL PENAL CODE § 2.01 cmts. 1 & 2 (Official Draft and Revised Comments 1985). Because the Model Penal Code's list of such conditions was not imported into our Code, we have recognized that certain conditions not included in the ALI model can be covered under the Indiana statute. *See McClain v. State*, 678 N.E.2d 104, 108 n.7 (Ind. 1997).

*Davidson v. State*, 849 N.E.2d 591, 593 (Ind. 2006).

In this case, Curnutt was allowed to provide testimony to support his argument that his conduct was the result of somnambulism, and thus, not voluntary. The jury, however, chose to disbelieve Curnutt's contention. Had the jury agreed with Curnutt, the jury would have found that the State failed to prove beyond a reasonable doubt that Curnutt committed the crimes charged knowingly or intentionally. The jury was accurately and fully instructed on those concepts. Furthermore, the jury instructions as a whole did not mislead the jury, and the absence of a separate instruction on voluntariness did not prejudice Curnutt.

Curnutt contends that there is insufficient evidence to support his conviction for battery as a class B felony. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Henley v. State*, 881 N.E.2d 639 (Ind. 2008). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. at 652.

8

We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Henley v. State*, 881 N.E.2d 639. Armed with the appropriate standard of review, we address Curnutt's contentions here in turn.

Regarding Curnutt's class B felony conviction, he claims that his actions did not create a substantial risk of death and did not cause extreme pain. In order to convict Curnutt of battery as a class B felony, the State was required to establish beyond a reasonable doubt that Curnutt knowingly or intentionally touched G.H. in a rude, insolent, or angry manner, resulting in serious bodily injury to G.H., who was less than fourteen years of age, and Curnutt was more than eighteen years of age. I.C. § 35-42-2-1(a)(4). Serious bodily injury is defined as "bodily injury that creates a substantial risk of death or that causes . . . extreme pain. Ind. Code Ann. § 35-31.5-2-292 (West, Westlaw current through 2013 1st Reg. Sess. and 1st Tech. Sess.).

The evidence most favorable to Curnutt's conviction established that Curnutt put his hands around G.H.'s neck and choked him so hard he could not breathe or say a word. The choking continued for what seemed like a half hour to G.H. As a result of Curnutt's actions, G.H.'s eyes appeared to be bloodshot. Dr. Boone, who examined G.H., testified that he found stress petechial in G.H.'s eyes, which appears in people who have choked to death, and which was consistent with G.H.'s account of what his father had done to him. Dr. Boone stated that in his opinion G.H.'s injuries were caused by severe force such that, based on his observations and G.H.'s account, there was a risk that G.H. could have died from Curnutt

9

choking him. This evidence is sufficient to support Curnutt's conviction for battery as a class B felony.

Additionally, G.H. testified that on a scale of zero to ten, where ten represented the highest level of pain and zero represents the least, G.H. rated the pain from the choking as a nine and one-half. The next day when he was examined by medical personnel, G.H. rated his pain on the same scale as a six. Again, this evidence supports Curnutt's conviction for battery as a class B felony.

Curnutt also invokes the incredible dubiosity rule to support his contentions. "Within the narrow limits of the 'incredible dubiosity' rule, a court may impinge upon a jury's function to judge the credibility of a witness." *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). For testimony to be disregarded based on a finding of "incredible dubiosity," it must be inherently contradictory, wholly equivocal, or the result of coercion. *Love v. State*, 761 N.E.2d 806. Moreover, there must also be a complete lack of circumstantial evidence of the defendant's guilt. *Id*. This rule is rarely applicable. *Id*.

Curnutt argues that there is conflicting evidence of the level of pain G.H. suffered and that the evidence of pain is uncorroborated. He directs us to G.H.'s testimony about the pain level being both nine and one-half and six. A complete reading of the record reveals that the differing pain levels represented the pain at the time of the choking and the resulting pain the day after the choking. Furthermore, G.H.'s testimony referring to zero, was a correction of the parameters of the scale of pain, zero to ten as opposed to one to ten. We are unpersuaded by Curnutt's argument here.

10

Moreover, G.H.'s testimony was not uncorroborated. Curnutt claims that Dr. Boone's testimony about G.H.'s pain amounted to speculation. Dr. Boone testified that he was a board-certified emergency room physician with thirty-three years of experience. He testified about the conclusions he drew from examining G.H. and from G.H.'s account of what had happened. Curnutt's argument amounts to an invitation for us to reassess Dr. Boone's testimony, testimony upon which the jury clearly relied and found credible. We are forbidden to undertake that task here. *Henley v. State*, 881 N.E.2d 639.

Curnutt also argues that his sentence is inappropriate in light of the nature of the offense and the character of the offender. Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences. Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task. *Cardwell v. State*, 895 N.E.2d 1219 (Ind. 2008). Per Indiana Appellate Rule 7(B), we may revise a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Wilkes v. State*, 917 N.E.2d 675, 693 (Ind. 2009), *cert. denied*, 131 S.Ct. 414 (2010). "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d at 1223. Curnutt bears the burden on appeal of persuading us that his sentence is inappropriate. *Childress v. Sta*te, 848 N.E.2d 1073 (Ind. 2006). The determination of whether we regard a sentence as appropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given

case." *Cardwell v. State*, 895 N.E.2d at 1224. Moreover, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Id*. at 1225. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original).

In order to assess the appropriateness of a sentence, we first look to the statutory ranges established for the classification of the relevant offenses. Ind. Code Ann. § 35-50-2-5 (West, Westlaw current through 2013 1st Reg. Sess. and 1st Tech. Sess.) provides that a person who commits a class B felony "shall be imprisoned for a fixed term of between six (6) and twenty (20) years, with the advisory sentence being ten (10) years." I.C. § 35-50-2-7 (West, Westlaw current through 2013 1st Reg. Sess. and 1st Tech. Sess.) provides that a person who commits a class D felony "shall be imprisoned for a fixed term of between six (6) months and three (3) years, with the advisory sentence being one and one-half (1 ½) years." When a person admits to or is found to be an habitual offender, I.C. § 35-50-2-8(h) (West, Westlaw current through 2013 1st Reg. Sess. and 1st Tech. Sess.) provides in pertinent part that the trial court "shall sentence a person found to be a habitual offender to an additional fixed term that is not less than the advisory sentence for the underlying offense nor more than three (3) times the advisory sentence for the underlying offense. However, the additional sentence may not exceed thirty (30) years."

It is here where we must address *sua sponte* an issue presented by the trial court's sentencing statement. It appears from the record that the trial court intended for the two convictions to be served consecutively to the back-up time imposed on the revocation of Curnutt's probation, but concurrently with each other. The trial court stated that the sentence for Curnutt's habitual offender status should been served consecutively. Nonethess, when a defendant is convicted of multiple offense and found to be a habitual offender, the trial court must specify which of the sentences shall be enhanced. *Tipton v. State*, 981 N.E.2d 103, 105 n5 (Ind. Ct. App. 2012) (court must specifiy which conviction is to be enhanced). It is well settled that a "habitual offender finding does not constitute a separate crime nor does it result in a separate sentence, rather it results in a sentence enhancement imposed upon the conviction of a subsequent felony." *Hendrix v. State*, 759 N.E.2d 1045, 1048 (Ind. 2001) (*citing Greer v. State*, 680 N.E.2d 526, 527 (Ind. 1997); *Pinkston v. State*, 436 N.E.2d 306, 307–08 (Ind. 1982)). Given the fact that the trial court assigned a twenty-year sentence to Curnutt's habitual offender status, it is apparent that the trial court intended for the enhancement to attach to Curnutt's conviction for the class B felony. We remand to the trial court with instructions to correct its sentencing order, abstract of judgment, and chronological case summary to reflect that the habitual offender enhancement serves as an enhancement of Curnutt's class B felony sentence.

Regarding the nature of the offense, the record reveals that Curnutt became drunk and abused his position of trust by battering his then seven-year-old son, nearly choking him to death. When G.H. attempted to escape from his father, Curnutt slapped him with an open

hand causing further injury, which allowed Curnutt to recapture G.H. and choke him yet again. Curnutt did not accompany Davis and G.H. when Davis took G.H. to the hospital and was not at home upon their return. After the incident, Curnutt did not see his son again prior to Davis returning G.H. to his mother. G.H. experienced severe bruising and red marks on his face, arms, and chest. Curnutt could have killed G.H. by choking him. Additionally, Curnutt committed these offenses while on probation. We cannot say that Curnutt's sentence is inappropriate in light of the nature of the offense.

Regarding the character of the offender, we note Curnutt's criminal history, which includes six juvenile adjudications amounting to theft, conversion, and illegal consumption if committed by an adult. Curnutt's adult criminal history includes eight prior felony convictions including burglary, theft, and possession of marijuana. Curnutt was on probation when he was arrested and found guilty of the present offenses. At the time of sentencing, Curnutt had two pending counts of public intoxication, each charged as class B misdemeanors. Curnutt abused his position of trust with his son, battering him such that he might have died. Curnutt admitted during the course of pre-sentence investigation that he struggles with his consumption of alcohol to excess. We find that Curnutt's sentence is not inappropriate in light of his character.

Judgment affirmed and remanded.

KIRSCH, J., and BAILEY, J., concur.

14